MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2015 ME 21
Docket:        BCD-14-194
Argued         February 12, 2015
Decided:       March 5, 2015

Panel:         ALEXANDER, MEAD, GORMAN, and HJELM, JJ.

JAMES G. STANLEY JR. et al.

v.

MICHAEL A. LIBERTY et al.

ALEXANDER, J.

[¶1]  Michael A. Liberty ("Liberty") and five corporations under his control ("the Liberty corporate entities") appeal from a judgment of the Business and Consumer Docket (*Horton, J.*) confirming a binding arbitration award in favor of James G. Stanley Jr., Barbara Stanley, and Northeast Marine Services, Inc. (collectively "Stanley").  *See* 14 M.R.S. §§ 5937, 5940 (2014).

[¶2]  Liberty and the Liberty corporate entities contend that the court erred in confirming, without modification, the arbitration award because the arbitrator exceeded his powers by (1) finding that Stanley should not be liable as a fiduciary for poorly documented personal transactions among Stanley, Liberty, and the Liberty corporate entities; (2) piercing the corporate veil and imposing personal liability on Liberty for certain transactions between Stanley and the Liberty

corporate entities; and (3) misinterpreting or miscalculating the inflation adjustment provision of the retirement contract that generated this litigation. Liberty and the Liberty corporate entities also contend that the court erred by not including certain additional language suggested by them in its judgment confirming the arbitration award. Respecting the very narrow scope of courts' review of arbitration awards, *see Leete & Lemieux, P.A. v. Horowitz*, 2012 ME 115, ¶ 12, 53 A.3d 1106, we affirm.

## I. CASE HISTORY

[¶3] Between August 2012 and July 2013, James G. Stanley Jr., Barbara Stanley, and their company Northeast Marine Services, Inc., were parties to a binding arbitration with Michael A. Liberty and the Liberty corporate entities regarding contractual and fiduciary disputes arising from Stanley's tenure as an officer and director of the Liberty corporate entities. By agreement of the parties, the arbitration proceedings were not recorded. The case history that follows is drawn from the factual findings in the arbitrator's award. *See Rainbow v. Ransom*, 2010 ME 22, ¶ 3, 990 A.2d 535 (stating that when there is no transcript of hearings below, on review we assume that the record supports the findings of fact and discretionary rulings on procedure and remedies made during the course of the proceeding).

[¶4]   Michael Liberty was the sole shareholder or sole director of five corporations: Liberty Group, Inc. ("LGI"); Liberty Management, Inc.; Equity Builders, Inc.; Mainland Development Company; and American Housing Preservation Corporation ("AHPC").[1]   The Liberty corporate entities collaborated on real estate ventures and government-subsidized housing projects.  "LGI was the literal and *de facto* parent of the other [corporate entities] and often guaranteed personal debt and obligations of [Michael] Liberty and [of] the other Liberty [corporate entities]."

[¶5]  James G. Stanley, a certified public accountant, joined LGI in 1987 as a chief financial officer ("CFO").  During the next twenty-plus years, he worked for all of the Liberty corporate entities in various official capacities.  By 1994, Stanley had become President and CEO of LGI.  Some of the Liberty corporate entities reported to him as CFO, while others reported to him as CEO.  Stanley reported to Liberty directly and on a daily basis during his employment.[2]

[¶6]   During his tenure with the Liberty corporate entities, the arbitrator found, Stanley "occasionally assisted [Liberty and his corporate entities] in certain activities, or was aware of actions . . . [that] could be said to mislead creditors,

---

[1] The Liberty corporate entities were all closely held Maine corporations.

[2]  The arbitrator's statement of facts indicates that, during his tenure with the Liberty corporate entities, there was no distinction between Stanley's work for the corporate entities and Stanley's work for Michael Liberty personally.

4

limited partners, other investors and regulators, and be questionable under [f]ederal tax laws."

[¶7]    The arbitrator also found that the Stanleys and their company, Northeast Marine Services, Inc., "(1) often made loans to the Liberty [corporate entities], [Michael] Liberty, and affiliated entities; and (2) often put up or sold personal assets to guarantee obligations of [the Liberty corporate entities]."

[¶8]    In addition, due to "cash shortages and crises," Stanley sometimes made loans and advances directly "to third-party-vendors or creditors of the Liberty [corporate entities] . . . ."  When the Liberty corporate entities repaid the loans and advances that had been made to Michael Liberty personally, to his family members, or paid directly by Stanley to third parties, "the result was a payment to [Stanley] without a corresponding entry for the original loan or advance on the books of the Liberty [corporate entities]."  "This created the possible impression that [Stanley was] receiving funds without proof of justification . . . ."  "The press of cash crises, shortage of operating capital, . . . [and] an 'off the books' approach to many transactions . . . made accurate record keeping and sorting out all the financial transactions difficult and ultimately impossible."  Stanley himself also occasionally "did not provide customary vouchers or paper back up for his loans and advances and the reimbursement he sought."  There were, however, "contemporaneous e-mail[s] between . . . Liberty

and accounting staff . . . documenting and explaining requests for repayment of loans and advances, plus interest, of which . . . Liberty was generally aware." As the arbitrator found, "[t]here were thousands of loans, advances and repayments, as well as payments to . . . Stanley of his compensation and benefits, over at least [ten] years."

[¶9]   In 2003, Stanley expressed to Liberty concerns regarding health problems and broached the possibility that he would need to leave his employment. Liberty and Stanley executed a letter "confirming an agreement to compensate . . . Stanley certain amounts upon his retirement from active employment with LGI," including an election to retire, effective immediately.  The package consisted of a $1,000,000 "base payment" plus a six-percent "inflation adjustment," such that "the longer . . . Stanley worked and waited to retire, the higher his retirement package" would be.

[¶10]   Stanley continued working for Liberty and the Liberty corporate entities.  However, relations between the two began to deteriorate in 2007.  Around this time, Stanley and Liberty "periodically discussed" payments owed and inadequate corporate financial records.  Liberty believed that, as a result of the numerous, poorly documented transactions noted above, Stanley owed a net balance to the Liberty entities.  Stanley believed that he was owed money by Liberty and the Liberty corporate entities.

[¶11]  In 2010 and 2011, Stanley, then serving as Director and President of AHPC, was "purposefully frozen out of the planning and communications" for the closing of a particular real estate project of AHPC.  Stanley was placed on administrative leave on November 28, 2011, allegedly to "allow him time to straighten out his employee loan accounts."  Through subsequent exchanges of information, Stanley and Liberty identified several million dollars in transactions, both between them and between Stanley and the Liberty corporate entities, that could not be reconciled based on existing corporate records.

[¶12]  On December 15, 2011, Stanley gave notice of his retirement.  Before his effective retirement date of March 31, 2012, however, Liberty terminated Stanley's employment, alleging that Stanley had failed to "adequately explain an alleged net outflow of funds."  Liberty "refused to honor" Stanley's claims for retirement benefits under the retirement letter, citing a "claimed offset to amounts owed . . . on the employee loan account, and [an] alleged breach of fiduciary duties owed by . . . Stanley."

[¶13]  By an agreement dated August 17, 2012, the parties appointed an arbitrator and agreed to resolve their disputes through binding arbitration.  By the agreement the parties submitted to binding arbitration

> [a]ll claims, disputes, controversies or causes of action . . . between the Stanleys . . . on one hand, and Liberty and the Liberty Companies . . . on other hand, arising out of (i) the facts and circumstances

pertaining to the tenure of J. Stanley as an officer or employee of the Liberty Companies; or (ii) the facts and circumstances alleged in the Complaint attached hereto as Exhibit A, including but not limited to the causes of action alleged in Exhibit A.

The arbitration agreement also specified that any then-existing claims between the parties not submitted to the arbitration "shall be forever waived and forfeited."

[¶14]  In the complaint referenced as Exhibit A, Stanley asserted seventeen counts against Liberty and the Liberty corporate entities, including, in relevant part, (1) a claim for breach of contract for severance payments owed pursuant to the retirement letter; and (2) a claim seeking to hold Liberty personally liable for breach of the retirement contract.[3]  Liberty and the Liberty corporate entities asserted in their counterclaim that Stanley had breached his fiduciary duties of loyalty and care by failing to account properly for his transactions between 2004 and 2011 and to repay the amounts owed to the Liberty corporate entities.

[¶15]  After three days of testimony supported by significant documentation, the arbitrator decided all claims, defenses, and counterclaims in a ninety-nine-page award.  Many of Stanley's claims, particularly those that involved third parties, were rejected.  However, the three main issues relevant to this appeal were decided in Stanley's favor.

---

[3]  Stanley also asserted and recovered under a claim for defamation regarding a 2012 event when Liberty purportedly publicly accused Stanley of stealing or embezzling funds from the Liberty corporate entities.  The arbitrator's determination of this and other claims is not an issue on appeal.

[¶16]   First, the arbitrator applied the Maine Business Corporation Act, 13-C M.R.S. §§ 101-1702 (2014), to conclude that although Liberty and the Liberty corporate entities met their initial burden to establish possible conflicting-interest transactions, Stanley had satisfied his burden to show that any such transactions were fair to the Liberty corporate entities and that, accordingly, Stanley had not breached his fiduciary duties as a director of the Liberty corporate entities.  *See* 13-C M.R.S. § 872(2)(C).  This finding also precluded the Liberty corporate entities from using any alleged breach of fiduciary duty as a defense to their obligations pursuant to the retirement agreement.  In addressing the issue of breach of fiduciary duty, the arbitrator relied on his findings that inadequate record keeping had been an accepted and customary practice of the Liberty corporate entities throughout Stanley's employment, and that the parties "share responsibility in roughly equal shares" for the resulting inability to fully reconstruct the books or establish sums paid and sums due to any degree of certainty.

[¶17]   Second, the arbitrator determined that the 2003 retirement letter was a binding and enforceable contract and that LGI breached the agreement by failing to make the payments beginning ninety days after Stanley gave notice of his retirement on December 15, 2011.  Third, the arbitrator held Liberty personally liable for LGI's breach of the retirement agreement, finding that LGI was the alter ego of Liberty, and that given Stanley's direct support of the Liberty corporate

entities and Liberty personally, it would be "unjust and inequitable" if Stanley could look only to LGI for satisfaction.

[¶18]  The arbitrator found LGI and Liberty jointly and severally liable for unpaid retirement obligations in the initial amount of $1,836,499.20, to be paid in sixty monthly installments.[4]  To reach this amount, the arbitrator determined that the retirement letter was ambiguous as to when the inflation adjustment began to accrue on the base payment, and more specifically, as to whether the years before Stanley's retirement notice were included in the calculation.  Based on a finding that the purpose of the agreement was to entice Stanley to continue working for the Liberty corporate entities, the arbitrator determined that the inflation adjustment began accruing as of November 1, 2003, the day after execution of the retirement letter, rather than the 2011 date when Stanley retired.

[¶19]  Upon a motion by Liberty and the Liberty corporate entities pursuant to the Maine Uniform Arbitration Act, 14 M.R.S. §§ 5927-5949 (2014), the arbitrator later modified the award.  *See id*. § 5935.  Finding that he had miscalculated the additional post-award inflation amount on the basis of a monthly amortization, rather than "at the end of each calendar year" as required by the

---

[4]  The total arbitration award was larger, also including a $175,000 award on Stanley's claim for defamation and a declaratory judgment holding AHPC conditionally liable to pay Stanley $500,000 in the event of a sale or refinancing of a certain portfolio of properties located in Colorado, provided the transaction netted at least $10,000,000 in proceeds.  These awards were confirmed by the trial court along with the rest of the arbitration award.

retirement agreement, the arbitrator reduced the post-award inflation adjustment amount for a final total award of $1,778,495.08 based on the retirement agreement.

[¶20]  Stanley filed a motion to confirm the arbitration award, pursuant to 14 M.R.S. § 5937, in the Superior Court (Cumberland County).  Liberty and the Liberty corporate entities then moved to vacate, correct, or modify the final, corrected award pursuant to 14 M.R.S. §§ 5938, 5939, arguing that the arbitrator had exceeded his powers and that his decision was based on a manifest disregard of the applicable law and the retirement contract.  *See* 14 M.R.S. § 5938(1)(C).

[¶21]  The matter was subsequently transferred to the Business and Consumer Docket.  After a contested hearing, the court (*Horton, J.*) affirmed the arbitration award in full.  In its order, the court noted that Liberty and the Liberty corporate entities were "essentially arguing errors of law," and concluded that the "arbitrator's analysis and conclusions . . . do not indicate manifest disregard of the law or any exceedance of authority."

[¶22]  On April 22, 2014, the court granted Stanley's motion for entry of judgment, declining to adopt certain additional clarifying language regarding the acceleration clause as requested by Liberty and the Liberty corporate entities. Liberty and the Liberty corporate entities brought this timely appeal pursuant to 14 M.R.S. § 5945 and M.R. App. P. 2(b)(3).

## II.  LEGAL ANALYSIS

[¶23]  Arbitration appeals are governed by the Maine Uniform Arbitration Act, 14 M.R.S. § 5945(1).  Our review of a court's confirmation of an arbitration award is confined to errors of law only, and the award will be upheld unless the court was compelled to vacate it.  *Randall v. Conley*, 2010 ME 68, ¶ 11, 2 A.3d 328; *Union River Valley Teachers Ass'n v. Lamoine Sch. Comm.*, 2000 ME 57, ¶ 5, 748 A.2d 990.  In reviewing an arbitrator's award directly, the primary issue is whether the award was within the arbitrator's authority.  "When an arbitrator stays within the scope of [his or her] authority, the award will not be vacated even when there is an error of law or fact."  *Commercial Union Ins. Co. v. Me. Emp'rs Mut. Ins. Co.*, 2002 ME 56, ¶ 8, 794 A.2d 77; *see also Leete & Lemieux*, 2012 ME 115, ¶ 12, 53 A.3d 1106.  The burden of demonstrating that an arbitrator exceeded his or her authority lies with the party seeking to vacate the award.  *Randall*, 2010 ME 68, ¶ 21, 2 A.3d 328.

[¶24]  In challenging the arbitrator's findings that Stanley had not engaged in a breach of fiduciary duty in his transactions involving the Liberty corporate entities, and his interpretation and application of the ambiguous inflation adjustment clause, Liberty and the Liberty corporate entities essentially ask us to

12

review fact-findings by the arbitrator.[5] Such findings are not reviewable pursuant to our standard of review and, in any event, could not be reviewed in this case because the parties chose not to record the hearing. Those issues are not discussed further.

[¶25] Liberty and the Liberty corporate entities also argue that the arbitrator exceeded his authority. This is a difficult claim considering the parties' agreement to submit to the arbitrator "[a]ll claims, disputes, controversies or causes of action" between the parties. We have observed that "for arbitrators to make an error of law is not to exceed their powers," and "[a] reviewing court is not empowered to overturn an arbitration award merely because it believes that sound legal principles were not applied." *Anderson v. Willey*, 514 A.2d 807, 810 (Me. 1986). "In bargaining for an arbitrator's decision, the parties bargain for the arbitrator's interpretation of the law as well." *Id.*

[¶26] When an arbitrator's decision rests on interpretation of a contract under which the parties' disputes arose, an arbitrator exceeds his or her authority

---

[5] Although Liberty argues in the alternative that even if the court was not compelled to vacate the portion of the award interpreting the inflation adjustment provision, the award should nonetheless have been subject to modification, we find that he has not met his burden to show an "evident miscalculation" or an imperfection "in a matter of form." 14 M.R.S. § 5939(1)(A), (C) (2014); *see also Cutler Assocs., Inc. v. Merrill Trust Co.*, 395 A.2d 453, 456 (Me. 1978). As an initial matter, Liberty appears to conflate his arguments for modification and vacatur, asserting that the arbitrator "miscalculated" the total award amount based on his construction of what he found to be an ambiguity in the contract. Here, the arbitrator did not make a clerical or mathematical error, but rather made a substantive decision to include a pre-award inflation adjustment based on his interpretation of the contract.

pursuant to 14 M.R.S. § 5938(1)(C) only if the arbitrator goes outside the agreement and "[only] if all fair and reasonable minds would agree that the construction of the contract made by the arbitrator was not possible under a fair interpretation of contract." *Granger N., Inc., v. Cianchette*, 572 A.2d 136, 139 (Me. 1990) (alteration in original). We will uphold an award "if *any* rational construction of the agreement *could* support [it]." *Dep't of Corr. v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 93*, 2000 ME 51, ¶ 9, 747 A.2d 592. Liberty and the Liberty corporate entities have not demonstrated that the arbitrator exceeded his very broad authority, or that the arbitrator adopted an interpretation of the contract that was not possible under a fair interpretation of the contract.

[¶27] Liberty's remaining issue addresses the arbitrator's decision to pierce the corporate veil and make Liberty personally liable for obligations of his closely-controlled corporations. A party seeking to pierce the corporate veil to hold a corporate officer or director personally liable for the actions of a corporation must demonstrate that (1) the officer or director abused the privilege of a separate corporate identity; and (2) an unjust or inequitable result would occur if the court recognized the separate corporate existence. *Town of Lebanon v. E. Lebanon Auto Sales LLC*, 2011 ME 78, ¶ 8, 25 A.3d 950.

[¶28] Here, the arbitrator made thorough findings of fact, identifying seven factors supporting a finding of abuse of the privilege of a separate corporate

identity. *See Johnson v. Exclusive Props. Unlimited*, 1998 ME 244, ¶ 7, 720 A.2d 568. The arbitrator then found that it would be unjust and inequitable to recognize the corporate form, given Liberty's position as an officer and, in effect, the alter ego of the corporations. Even if the arbitrator's analysis presented errors of law or fact, and we see none, the trial court would not have been compelled to vacate the award according to the deferential standard of review. *See Leete & Lemieux*, 2012 ME 115, ¶ 12, 53 A.3d 1106.

[¶29] Although Liberty is correct in arguing that Maine law imposes "more stringent standards" for piercing the corporate veil in contractual disputes, *see Theberge v. Darbro, Inc.*, 684 A.2d 1298, 1301 (Me. 1996), an arbitrator may nonetheless pierce the corporate veil when the evidence supports a finding that the corporation is merely an alter ego of an individual and when necessary in the interests of justice. Just as parties to a contract are "presumed to have voluntarily and knowingly entered into agreement with a corporate entity," *id.*, parties who enter into voluntary arbitration have "bargain[ed]" for the arbitrator's decision and his interpretation of the law, *see Anderson*, 514 A.2d at 810, and the court was not compelled to vacate the award on this basis.

[¶30] The other issue that Liberty and the Liberty corporate entities raise, that the trial court declined to include certain language in its judgment as suggested

by Liberty and the Liberty corporate entities, was addressed to the sound discretion of the trial court. That discretion was not abused.

The entry is:

Judgment affirmed.

_____

**On the briefs:**

George J. Marcus, Esq., and Daniel L. Rosenthal, Esq., Marcus, Clegg & Mistretta, P.A., Portland, for appellants Michael A. Liberty and the Liberty corporate entities

George T. Dilworth, Esq., and George Royle V, Esq., Drummond Woodsum, Portland, for appellees James G. Stanley, Jr., Barbara Stanley, and Northeast Marine Services, Inc.

**At oral argument:**

Daniel Rosenthal, Esq., for appellants Michael A. Liberty and the Liberty Corporate entities

George T. Dilworth, Esq., for appellees James G. Stanley, Jr., Barbara Stanley, and Northeast Marine Services, Inc.

Business and Consumer Court docket number CV-2013-62
FOR CLERK REFERENCE ONLY