MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:     2016 ME 148
Docket:       Ken-15-466
Argued:       May 4, 2016
Decided:      October 6, 2016

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Majority:     SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, HJELM, and HUMPHREY, JJ.
Dissent:      JABAR, J.

STATE OF MAINE et al.

v.

MAINE STATE EMPLOYEES ASSOCIATION, SEIU LOCAL 1989


HJELM, J.

[¶1]   The State of Maine and the Department of Health and Human Services (collectively, the State) appeal from a judgment entered in the Superior Court (Kennebec County, *Murphy, J.*) denying their motion to vacate an arbitration award reinstating Susan Berube to her employment position at DHHS.   During the grievance process, which included the arbitration proceeding, Berube was represented by the Maine State Employees Association, SEIU Local 1989.   On this appeal, the State argues, inter alia, that the court erred when it concluded that the arbitrator did not exceed her powers by determining that the grievance was arbitrable even though the arbitration request was filed after the deadline established in the Collective

Bargaining Agreement as enlarged by agreement of the State and MSEA. We agree, vacate the judgment, and remand with instructions to vacate the arbitration award.

## I. BACKGROUND

[¶2]   The following facts are undisputed and are drawn from the arbitrator's June 2014 interim arbitration award and her January 2015 final arbitration award. *See Stanley v. Liberty*, 2015 ME 21, ¶ 3, 111 A.3d 663.

A.    Collective Bargaining Agreement

[¶3]  At relevant times during Berube's employment at DHHS, MSEA and the State were parties to a Collective Bargaining Agreement (CBA) that covered employees in the professional and technical services bargaining unit, including Berube.   Article 33 of the CBA contains the procedures for a four-step employee grievance process.  The first three steps consist of an oral grievance to the employee's immediate supervisor, a written grievance to a designated agency official, and an appeal to the Chief Counsel Office of Employee Relations.  The fourth step—which is at issue here—is arbitration. As the CBA provides,

> [i]f the grievance has not been satisfactorily resolved at Step 3, then MSEA-SEIU may submit the grievance to arbitration by submitting a request for arbitration to the Chief Counsel Office of Employee Relations as well as a statement of the grievance

specifying the Article, section or clause of the contract alleged to have been violated, along with the concise statement of facts surrounding the issue and the remedial action requested. The request for arbitration shall be received by the Office of Employee Relations through personal service or by mailing by registered or certified mail *within fifteen (15) workdays of the receipt of the Step 3 decision.*

(Emphasis added.)

[¶4] Article 33 also contains the following general provisions regarding the grievance procedures:

3.2 All of the time limits contained in this Article may be extended by mutual agreement of the parties and *such extensions shall, in order to be effective, be confirmed in writing.* The parties may mutually agree to bypass steps of the grievance procedure.

3.3 In no event can a grievance be taken to the next or any succeeding step of this procedure unless the employee and/or his/her representative meets the time limits or extensions thereof.

(Emphasis added.) Section 2.4(c) in Article 33 of the Agreement provides that "[t]he arbitrator shall have no authority to add to, subtract from or modify any provisions of this Agreement."

B. Berube's Termination and the Grievance

[¶5] Berube was employed by DHHS from 1984 to June 2013, when she was terminated for having alcohol on her breath while meeting with a client. This case arises out of Berube's termination.

[¶6] Berube was the subject of a separate disciplinary action in 2002 for consuming alcohol at work. As a result of that incident, Berube, MSEA, and the State entered into a "Last Chance Agreement," which resulted in Berube being suspended for one week. Pursuant to the terms of the Last Chance Agreement, Berube agreed that "[as] a condition of her employment," she would "neither possess nor consume alcohol or any illegal drug at any time she is receiving compensation . . . and that a violation of these conditions would result in termination of her employment with the State."

[¶7] In 2005, Berube became a case manager working with DHHS clients who receive mental health services. On March 26, 2013, Berube drove from the DHHS Regional Office in Machias, where she worked, to a residential facility where a client lived in order to complete some paperwork. Upon arriving at the residence, two employees of the social services organization that managed the residence detected a strong odor of alcohol on Berube's breath. The employees reported the information to the organization's Director of Community Services, who then notified Berube's supervisor at DHHS and sent a written request that Berube be removed from other cases involving the organization's clients. DHHS investigated the incident, found the

allegations to be credible, and, in June 2013, terminated Berube from employment.

[¶8] Following Berube's termination, MSEA initiated the grievance process on her behalf. The grievance proceeded through Step 3, with results adverse to Berube. The Step 3 decision arrived at MSEA's office on August 29, 2013, and a receptionist signed the certified mail receipt acknowledging delivery and placed it in an in-box.

[¶9] Two MSEA employees were responsible for keeping track of grievance steps and deadlines. During parts of August and September 2013, including the time when the Step 3 decision in Berube's grievance arrived at MSEA's office, those employees were on leave, and their responsibilities were assigned to a temporary secretary. When the Step 3 decision in Berube's case arrived at MSEA's office, the temporary secretary took the decision from the in-box, and then date-stamped and filed it, but did not inform anyone else that the decision had arrived and did not enter the information in a computer program that MSEA used to track the status of grievances.

[¶10] MSEA's Director of Field Mobilization had been concerned about the possibility that the absence of the two employees could result in mistakes in MSEA's processing of grievances. As a result, he notified the State of the

6

employees' absence and requested a temporally limited waiver of the deadlines:

> [B]oth of our Member Support Specialists are out of work for at least the next two weeks. I am doing the best I can to stay on top of timelines, but as you know this is work they would typically administer. These absences began earlier this week with both of them being out on the morning of Tuesday 8/27. I do not normally do this work and there is potential for me to make a mistake. I am doing the best I can and really don't anticipate any mistakes, but I would appreciate it if you could give us a break on the enforcement of timelines in the interim during the time when they are both out. I believe one will be returning by Sept. 12. I know we've done this in the past, so if that is acceptable please let me know.

In response, the Chief Negotiator for the State's Office of Employee Relations replied:

> Of course we will work with you/MSEA while the Member Support Specialists are out. I will notify everyone in this office and the Department HR Directors that *we are waiving time requirements [from] 8/27 through 9/13 . . .*
>
> *Let's plan to pick up the timelines on Monday 9/16. We can touch base later if this needs to change.*

(Emphasis added.) None of the parties requested or agreed to any additional changes to the deadlines.

C.    Arbitration

[¶11]    On October 22, 2013—twenty-six workdays after the September 16 reinstatement of timelines agreed to by the Chief Negotiator for

the Office of Employee Relations—MSEA filed a request for arbitration on behalf of Berube pursuant to Step 4 of the grievance procedure, even though at that time, the MSEA employees who were responsible for tracking grievance timelines still had not learned that a Step 3 decision had been issued.

[¶12]  After an arbitrator was assigned to the case, the State challenged the timeliness of the demand for arbitration, and the State and MSEA submitted arguments on that issue.  The arbitrator entered an interim arbitration decision in June 2014, concluding that Berube's grievance was arbitrable.  The arbitrator found that the parties had agreed to a waiver of the deadlines in accordance with the CBA and that the language in the email exchange addressing deadlines was not "so exact or precise," as shown by the State's statement that it was willing to "touch base later if this needs to change."  The arbitrator stated that it would be "unacceptable" if Berube were denied the right to an arbitration hearing because of an internal administrative error committed by a temporary employee who was unfamiliar with the process.

[¶13]  In August and September 2014, the parties proceeded to an arbitration hearing on the merits of Berube's grievance, and in January 2015,

the arbitrator issued her decision reinstating Berube to her position. The arbitrator found that although Berube did have alcohol on her breath during the March 2013 incident, the Last Chance Agreement could not form the basis for Berube's termination because although the Agreement did not recite how long it would be effective, its duration was for only a reasonable amount of time and, having been executed in 2002, no longer governed Berube's employment. Accordingly, the arbitrator directed that the State restore Berube to her position at DHHS with full back pay and issue a written reprimand.

[¶14]  In March 2015, the State filed in the Superior Court a motion to vacate the award pursuant to 14 M.R.S. § 5938(2) (2015). The State argued in part that the arbitrator exceeded her powers by concluding that the State agreed to waive deadlines to an extent that would allow the Step 4 arbitration request to be deemed timely.[1]  *See id.* § 5938(1)(C).  The court denied the State's motion to vacate, concluding that the arbitrator did not exceed her authority when she found that Berube's request for arbitration was not

---

[1]  The State also asserted, as it does here, that the arbitrator exceeded her authority by concluding that the Last Chance Agreement was no longer in effect as of March 2013; and that as a matter of public policy, Berube should be terminated anyway because the arbitrator found that Berube did not testify truthfully when she denied that she had had alcohol on her breath and explained that the odor of alcohol may have been caused by her use of an electronic cigarette that had either a red wine or champagne flavor. Because we decide this appeal on other grounds, we do not reach these contentions.

time-barred, and affirming the entirety of the arbitrator's award. The State appealed pursuant to 14 M.R.S. § 5945(1)(C) (2015).

## II. DISCUSSION

[¶15] The State contends that the court erred by concluding that the arbitrator did not exceed her authority when she concluded that MSEA filed a timely request for arbitration and that the grievance therefore was arbitrable. Our review of an arbitrator's finding of substantive arbitrability is for errors of law, *see Champagne v. Victory Homes, Inc.*, 2006 ME 58, ¶ 8, 897 A.2d 803, and "[w]e will uphold the Superior Court's confirmation of an arbitration award unless the court was compelled to vacate the award," *see Dep't of Corr. v. AFSCME, Council 93*, 2000 ME 51, ¶ 8, 747 A.2d 592.

[¶16] The standard of review used to determine whether an arbitrator exceeded her power is "extremely narrow." *Id.* ¶ 9. The Uniform Arbitration Act, 14 M.R.S. §§ 5927-5949 (2015), "provides the exclusive grounds for a court to vacate an arbitration award," *HL 1, LLC v. Riverwalk, LLC*, 2011 ME 29, ¶ 28, 15 A.3d 725. As relevant here, "the court shall vacate an award where . . . [t]he arbitrators exceeded their powers." 14 M.R.S. § 5938(1)(C).

[¶17] The arbitrator's function is limited to interpreting and applying the collective bargaining agreement. *Caribou Bd. of Educ. v. Caribou Teachers*

*Ass'n*, 404 A.2d 212, 214 (Me. 1979). "It is the arbitrator's construction of a contract that is bargained for." *Dep't of Transp. v. Maine State Emps. Ass'n, SEIU Local 1989*, 606 A.2d 775, 777 (Me. 1992). An arbitrator exceeds her powers, however, when she bases her conclusion on a "manifest disregard of the contract," *id.*, and instead applies "[her] own individual concept of justice in the particular area involved," *Caribou Bd. of Educ.*, 404 A.2d at 214; *see also Dep't of Corr.*, 2000 ME 51, ¶ 8, 747 A.2d 592 (stating that an arbitration award will be sustained "if *any* rational construction of the agreement *could* support the award"); *Westbrook Sch. Comm. v. Westbrook Teachers Ass'n*, 404 A.2d 204, 209 (Me. 1979) (stating that a court can vacate an arbitrator's award only when it "is so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling" (quotation marks omitted)). "General rules of contract interpretation apply to questions of substantive arbitrability." *Champagne*, 2006 ME 58, ¶ 8, 897 A.2d 803.

[¶18] It is undisputed that MSEA did not file a request for arbitration until after the expiration of the deadline created in the CBA as enlarged by mutual agreement of MSEA and the State. The salient question is whether the arbitrator exceeded her powers when she concluded that the State had

waived the deadline to an additional extent that would allow the arbitration request to be deemed timely.

[¶19] In her email communications with an MSEA representative, the State's Chief Negotiator explicitly consented to waive grievance process deadlines from August 27 through September 13, 2013. In that email, the Chief Negotiator also wrote, "Let's pick up the timelines on Monday 9/16. We can touch base later if this needs to change." The Step 3 decision in Berube's grievance arrived at MSEA's office on August 29—a date within the period covered by the State's agreement. Therefore, based on the parties' agreement, the period in which Berube, through MSEA, was entitled to invoke Step 4 arbitration under Article 33 of the CBA commenced on September 16—the date that the State's Chief Negotiator had agreed to "pick up" the deadlines— and ended fifteen workdays later, on October 7. MSEA did not file its request for arbitration until October 22.

[¶20] The arbitrator found that the parties had agreed to a waiver to extend the deadline even beyond the October 7 deadline based on the sentence in the State's Chief Negotiator's email, "We can touch base later if this [waiver of deadlines through September 13] needs to change." The arbitrator reasoned that the State's willingness to "touch base" to consider a

further enlargement of deadlines signified "an intent to continue it, if circumstances required." As the arbitrator also found, however, there were no further deadline-related communications between the parties—MSEA did not request any further extensions of time or waivers of deadlines, and the State did not consent to any.

[¶21] The CBA explicitly requires that the parties may extend deadlines by mutual agreement—but that "such extensions shall, in order to be effective, be confirmed in writing." The CBA also states that an "arbitrator shall have no authority to add to, subtract from or modify any provisions of [the] Agreement."

[¶22] Through their exchange of emails, the parties satisfied the requirements governing extensions of deadlines when they agreed to toll the commencement of filing periods until September 16, because that extension was the product of mutual consent and was memorialized in writing. There was no basis, however, for the arbitrator's finding that any additional agreement by the State to extend the duration of the waiver met the requirements of the CBA that any such agreement be "in writing"—much less for a finding that the State actually agreed to a further extension of deadlines, when the State indicated only that it would be open to "touch[ing] base later."

[¶23]  By attributing to the State an agreement to waive deadlines beyond the date to which it in fact consented, and then enforcing a waiver that is necessarily deficient under the CBA, the arbitrator, in effect, re-wrote the terms of the CBA.  Instead, under any "rational construction" of the CBA, *see Dep't of Corr.*, 2000 ME 51, ¶ 9, 747 A.2d 592, MSEA's Step 4 arbitration request on behalf of Berube cannot be viewed as timely.   Because the arbitrator's contrary determination represents a "manifest disregard" of the CBA, the arbitrator exceeded her powers and—reasoning that it would be "unacceptable" if Berube were denied an arbitration hearing under the circumstances presented here—imposed her "own individual concept of justice." *See Caribou Bd. of Educ.*, 404 A.2d at 214.

[¶24]  We acknowledge the commendably cooperative attitude of the parties that resulted in the waiver of deadlines to the extent specified in their emails.  Equally commendably, the parties agreed to a waiver that was in the form of a written agreement as required by the CBA, and that contained a clear end date, with an explicit agreement of the date when the times would begin running again.

[¶25]   The grievance process and Berube's employment rights are governed by the CBA that the State and MSEA bargained for at the negotiating

14

table, not by the arbitrator's individual concept of justice. We must conclude, given the undisputed facts, that no rational construction of the CBA can support the arbitrator's determination that MSEA's request for arbitration on behalf of Berube was timely. Consequently, pursuant to section 3.3 of Article 33 of the CBA, Berube is not entitled to arbitration. We therefore vacate the judgment and remand for entry of a judgment vacating the arbitration award.

The entry is:

> Judgment vacated. Remanded to the Superior Court for the entry of a judgment vacating the arbitration award.

---

JABAR, J., dissenting.

[¶26] I respectfully dissent because a rational inference from the relevant language of the Collective Bargaining Agreement (CBA) and the emails in question supports the arbitrator's decision.

[¶27] It is well settled that in Maine, the Court's review of an arbitration award is a narrow one, and that we will uphold an award if "*any* rational construction of the [a]greement could support [it]." *City of Lewiston v. Lewiston Firefighters Ass'n, IAF, Local No. 785*, 629 A.2d 50, 52 (Me. 1993)

(citations omitted) (emphasis added).  Further, in determining if an arbitrator exceeded her authority in rendering a decision, we will "construe the underlying contract broadly, resolving all doubt in favor of finding that the arbitrator acted within [her] power."  *Union River Valley Teachers Ass'n v. Lamoine Sch. Comm.*, 2000 ME 57, ¶ 5, 748 A.2d 990.  As such, the Court will only vacate an award if the Superior Court itself was *compelled* to do so.  *AFSCME, Council 93 v. City of Portland*, 675 A.2d 100, 102 (Me. 1996) (emphasis added).

[¶28]  The issue before us centers upon the language contained within two emails between the parties, interpreted in light of the CBA governing the contested arbitration proceedings.  On August 13, 2013, a Maine State Employees Association (MSEA) representative contacted the Chief Negotiator for the State's Office of Employee Relations seeking a waiver of deadlines for certain cases then pending in the grievance process.  In his email, he explained that:

> Due to deaths in the family and sick leaves, both of our Member Support Specialists are out of work for at least the next two weeks.  I am doing the best I can to stay on top of timelines, but as you know this is work they would typically administer.  These absences began earlier this week with both of them being out the morning of Tuesday 8/27.  I do not normally do this work and there is potential for me to make a mistake.  I am doing the best I can and really don't anticipate any mistakes, but I would

16

appreciate if you could *give us a break on the enforcement of timelines* in the interim during the time when they are both out. I believe one will be returning by Sept. 12. I know we've done this in the past, so if that is acceptable please let me know.

(Emphasis added.) The Chief Negotiator agreed to the request, and replied:

Of course we will work with you/MSEA while the Member Support Specialists are out. I will notify everyone in this office and the Department HR directors that *we are waiving* time requirements form [sic] 8/27 through 9/13.

Let's plan to pick up the timelines on Monday 9/16. We can touch base later if this needs to change.

(Emphasis added.)

[¶29] An arbitrator could rationally conclude that, under the circumstances described by the MSEA representative, and based on the language of both the CBA and the emails in question, the State granted MSEA a waiver of the State's enforcement of deadlines for the cases MSEA received between August 27, 2013, and September 13, 2013, and that the email exchange was not merely a request for an "enlargement" or a "tolling" of deadlines for those cases.

[¶30] In holding that the email exchange in question constituted an extension of timelines only, the Court relies on the language of article 33, section 3.2 of the CBA providing that the parties may extend time limits if the

arrangement is mutually agreed upon and reduced to writing. That same section, however, also provides that "[t]he parties may mutually agree to bypass steps of the grievance procedure."[2] With regard to this section, the arbitrator noted in her interim decision that "[n]ot all collective bargaining agreements have language such as that in Section 3.2 permitting waivers of deadlines," concluding that such language evidenced the parties' intent to be accommodating in "fact specific circumstances and the desire to treat each other reasonably."

[¶31] The language of the email exchange between the parties, in light of the terms of the CBA providing for flexibility in the grievance process, supports the arbitrator's finding that the State granted MSEA a waiver of deadlines for the purposes of remedying problems arising out of the absence of key MSEA personnel. In his email, the MSEA representative conveys to the State's Chief Negotiator his fear that the absence of staff responsible for docketing the grievances could adversely affect employees with pending cases. In response to his concerns, the State's Chief Negotiator responded "[o]f course we will work with you/MSEA," and informed him that "we are

---

[2] The full text of article 33, section 3.2 is as follows: "All of the time limits contained in this Article may be extended by mutual agreement of the parties and such extensions shall, in order to be effective, be confirmed in writing. The parties may mutually agree to bypass steps of the grievance procedure."

*waiving the time requirements* form [sic] 8/27 through 9/13." (Emphasis added.) The State's Chief Negotiator added further that they could "touch base later if this needs to change."

[¶32] Although the Court concludes that the agreement between the State and the MSEA constituted an extension of deadlines, nowhere in the email exchange did either party mention the term "extension," or "tolling." Rather, the State granted MSEA a "waiver" of deadlines for the cases received during the timeframe in question. There is an important difference between the terms "waiver" and "extension." While Merriam-Webster defines the word "extension" as "stretching out or stretching forth," it defines "waiver" as the "act of . . . intentionally . . . abandoning a known right, claim or privilege." *Webster's Third New International Dictionary of the English Language Unabridged* (2002). As such, under the circumstances, it was reasonable for the arbitrator to conclude that the State chose to "intentionally abandon" the requirement that the cases in question be timely filed.

[¶33] Thus, given the circumstances relating to the string of absences, the terms of the CBA providing for the modification and bypass of grievance procedures, and the language of the emails in which the State purported to waive or grant MSEA a "break on the enforcement of deadlines" for the cases

received during the timeframe at issue, the arbitrator acted rationally in concluding that Berube's grievance was arbitrable.

[¶34]  It may be true, however, that a rational interpretation of the CBA in light of the email exchange supports the conclusion that the operative effect of the emails was to extend the time limits, not waive them.  But that is just one rational interpretation.  It was also rational of the Arbitrator to interpret the emails to constitute a waiver by the State of time limits for the cases in question so as to combat problems arising from the absence of key MSEA employees.  It is not up to us to impose our judgment as to what the best interpretation is.  Instead, our review is limited to determining whether the arbitrator's award was based on *any* rational interpretation of the agreement. If we find that it was—as I believe is the case here—then we must conclude that the arbitrator acted within her power when she found the case to be arbitrable, and thus we should have addressed the merits of the case.[3]

---

[3]  Because my colleagues did not get past the issue of arbitrability, I will not address the merits of the other issues raised by the State on appeal.

20

**On the briefs:**

Julie McKinley Armstrong, Esq., and Nicholas P. Laskey, Esq., Office of Employee Relations, Augusta, for appellants State of Maine and Department of Health and Human Services

Anne F. Macri, Esq., Maine State Employees Association, Augusta, for appellee Maine State Employees Association, Service Employees International Union Local 1989

**At oral argument:**

Julie McKinley Armstrong, Esq., for appellants State of Maine and Department of Health and Human Services

Anne F. Macri, Esq., for appellee Maine State Employees Association, Service Employees International Union Local 1989

Kennebec County Superior Court docket number CV-2015-27
FOR CLERK REFERENCE ONLY